## MATT. SHELTON v. THE STATE.

1. THEFT—EVIDENCE.— Whether direct or circumstantial, the evidence in a prosecution for theft should be of a character to repel the presumption of innocence, and lead the mind to a conclusion of guilt to a moral certainty.
2. SAME.— See the opinion *in extenso* for evidence held insufficient to support a conviction for theft of a steer.

APPEAL from the District Court of Milam.  Tried below before the Hon. W. E. COLLARD.

The opinion discloses the entire case.  The penalty assessed by the jury was a term of five years in the penitentiary.

*Breeding & Homan,* and *Smith & Trigg,* for the appellant.

*H. M. Holmes,* for the State.

HURT, J.   The appellant was convicted of the theft of a certain steer, upon the following evidence:

T. A. Kirk, State's witness, testified:  "I live in Milam county, Texas.   I know defendant Matt. Shelton.   I own stock in Milam county, Texas; have a mark and brand, and the same is recorded in Milam county.   I have stock in the range in Milam county near the residence of J. B. Rawls, and had some cattle in said range in the fall of 1879 and spring of 1880, near Mr. J. B. Rawls.   My brand is $\overline{\text{k}}$, mark, short crop in the left, and swallow fork in the right ear.   I think it was the spring of 1880 I saw one of my steers, four years old, at Mr. Rawls's; it was a white steer with a red head and in my mark and brand.   I intended to make a work-ox of the steer.   I never sold it to the defendant or any one else, nor did I give the defendant my consent to take it.   I have never seen the steer in the range since, nor have I ever seen the steer in the defendant's possession."

J. B. Rawls, State's witness, says:  "I live in Milam county, Texas, about four miles from Milano Junction. I know the defendant.   In the fall of 1879 the defendant came to my house.   He had two young men with him, neither of whom I knew.   They drove up to my house and penned with my cattle some cattle that I had sold, and one white steer with a red head, branded $\overline{\text{k}}$, marked

with a short crop off of the left ear, and a swallow fork in the right. This steer came to my place and took up with my cattle when it was two years old, and remained there, and slept at my pen most of the time until he was driven away by defendant at·four years old. At the time the defendant drove up this steer, I asked him if he knew the owner of this beef. I had always thought it was an estray. He said it belonged to Tom Kirk, and said that some time before he had bought a steer from Tom Kirk; that it had got away from him, and said that you will just take this one in the place of the one he had lost. This was a white steer with a red head. Defendant penned the bunch of cattle, cut out those I had sold to another man some time before, and turned out this white beef with a red head marked as above stated, and drove him away. I have never seen the steer in that range since. His accustomed range was within two miles of my house. The defendant came to my house twice and gathered and drove away cattle. The first time was about one month before the time he drove away this beef. He came in the morning, and penned about ten or eleven o'clock, and left after noon. The first time he penned in the evening, and drove off next morning. Defendant told me he was engaged in the butcher business, and was slaughtering one beef a day. I helped the defendant cut the cattle out of my pen, and among the rest, the white steer with a red head, branded k̅, and left my cattle in the pen."

J. S. Martin, for the State, testified as follows: "I live in Milam county, Texas, three-quarters of a mile from the residence of Mr. J. B. Rawls. I know the defendant. I know the steer charged to have been stolen. I know him well; he was a white steer with a red head and had some red spots back on his shoulders. He ranged about my place with Mr. J. B. Rawls's cattle, and sleeping at Mr. Rawls's pen from the time it was about two years old

until it was about four years old. The steer was marked a short crop off of the left ear, and a swallow fork in the right ear and branded k̄. The last time I saw the beef it was in the possession of the defendant. In the fall of 1879 the defendant drove a small bunch of cattle past my place, and had the steer charged to have been stolen with the bunch. I have never seen it since. I am well acquainted with the range, and have been hunting stock in the range. Have never seen the steer in the range. The defendant drove it past my house in the direction of Milano."

Tom Shelton, for the defendant, testified: "I know the defendant. He is my brother. I was with him when he went to get. the Rawls cattle. Bob Stevens was also with us. We drove up the cattle with all the cattle belonging to Mr. Rawls. Among them was a staggish looking steer of a red and white color, branded k̄, and marked crop off of left, and swallow fork in the right ear. The cattle all remained in the pen at Rawls's until next day, when we drove them away. When the cattle were turned out of the pen to drive, this steer came out with them. We drove them altogether about three-quarters of a mile, and past Martin's house. As we crossed a gully about 200 yards from Martin's house, the cattle separated a little, and defendant instructed us to cut the k̄ steer out, which we did, and ran him back through the woods towards Rawls's house. I never saw the steer afterwards, and don't think the defendant ever did. Defendant left Milam county in the latter part of December, 1879, to work on the railroad. He was getting out ties in Burleson county on the line of the Gulf, Colorado and Santa Fe Railroad. He did not return to the county until the fall of 1881. We drove the bunch of cattle from Rawls's to R. K. Stevens's, where we got some more, and from there drove them to my father's house, where we penned, counter-branded and turned them

upon the range. I never saw the ⊼ steer after we cut it out near Martin's house. There was no four year old steer in the bunch of any description, and I know there was none branded ⊼. Defendant had been buying cattle for a man by the name of White, who was making up a herd at Milano, but when he got these cattle there White had gone or moved his herd west, and for that reason defendant counter-branded the stock and turned them on the range. He did not buy or sell any more cattle after that time; he was not in the cattle business after that. He stayed at my father's until he went to Burleson county to work on the railroad. We drove these cattle from Rawls's about the 10th day of October, 1879. From that time until he went on the railroad he was on my father's farm all the time. He was not on the range after that time. I know because I lived with the defendant on my father's farm, and was with him every day. There was not so much as half a day passed that I was not in his company, and if he had gone on the range I would have known it."

On cross-examination, the witness stated: "The steer we drove from Rawls's pen was more red than white. He had some white on the sides, and some red pides on his sides. It was a red color with white spots."

Bob Stevens, for defendant, testified: "I was with the defendant Matt. Shelton when he got the cattle from Mr. Rawls. We drove up all the Rawls cattle and penned them to cut out what we wanted. Rawls was there when we drove the cattle that we wanted out of the pen. The steer branded ⊼ ran out with them. I remember the steer well. He was a red and white steer, branded ⊼. I knew Mr. Kirk's brand well. I knew this to be his brand. It was the only steer in that range in that brand. Don't remember the mark; don't know that I ever knew Kirk's mark. Don't notice marks much. I identified the steer as Mr. Kirk's by the brand. The steer went along

with the bunch of cattle until we passed Mr. Martin's about 200 yards, and, as we crossed a gully, defendant instructed us to cut the k̄ steer out, and we did so, and run him back toward Rawls's house through the woods. I never saw the steer afterwards. We drove the bunch of cattle to my brother R. K. Stevens's house, and there put in some of my brother's that he had sold to defendant, and then defendant, Tom Shelton, and my brother R. K. Stevens drove them to the house of defendant's father. They there penned, counter-branded and turned them on the range again. Defendant left the county about two and a half months after that, and went to Burleson county to work on the railroad. He did not come back to Milam county any more until last fall. The time we drove the steer from Rawls's, we penned the steer with other cattle at Rawls's, and the cattle remained there all night, and next morning we drove them away."

R. K. Stevens, for defendant, testified: "I know the defendant Matt. Shelton. He left Milam county to go to Burleson county on the railroad in December, 1879. I remember the time when he drove the Rawls cattle. Tom Shelton and my brother were with him. They drove the cattle to my house and there put in some that I had sold defendant. I helped to drive them from my house to the house of the defendant's father. I know Tom Kirk's brand, and have known it for years. It is k̄, but can't say that I know his mark. I don't pay much attention to marks, but always pay close attention to brands. There was no k̄ steer or k̄ animal of any sort in the bunch that defendant drove to my house. I noticed the brand of all the cattle in the bunch and know there was no such animal there as the one charged to have been stolen. I know the description of the animal described by the State's witness as the one charged to be stolen. I saw a steer in the range near Rawls's house in the spring of 1880, I think in March or April, that suited the

description of the Kirk steer. He was branded ⊼. I never heard that Kirk had but two head of cattle in that range, and one of them was a two year old heifer and the other a four year old steer. This steer, I would say from the description, is the one I saw in the spring of 1880. The defendant, after driving the cattle to his father's, counter-branded and turned them again on the range."

On cross-examination: "I do not remember the mark or brand of any other animal that was put in my pen by the defendant at the time he penned at my house. The one I saw on the range in the spring of 1880 was a red and white pided steer."

Milton Shelton, for the defendant, testified: "I know the defendant. He is my brother. He quit the cattle business in October, 1879. From that time till the latter part of December, 1879, he lived at my father's in Milam county, Texas. I lived two or three miles distant. I saw defendant often, and know that during that time defendant was not on the range, because he was working on my father's farm near where I lived. In the latter part of December, 1879, defendant went to Burleson county to work on the railroad. He did not come back to Milam county, or make it his home, until the fall of 1881, after he got through his contract on the Santa Fe Railroad, in Burleson county. He went to Denton county on the Dallas and Wichita Railroad, and remained in Northern Texas up to the time he returned to Milam county. I was with defendant most of the time, and know that he was not in the cattle business after October, 1879. When defendant went to Burleson county he took no cattle with him."

A. S. Russell, for defendant, testified: "I live in Milam county, Texas, and know the defendant. He is my son-in-law. He left Milam county in December, 1879, in company with me, to work on the Santa Fe Railroad in Burleson county. He took no cattle with him. From

Burleson county he went to Northern Texas, to take contracts on railroads building there. He did not return to Milam county until the fall of 1881. He was not on the range in Milam county after he left here in December, 1879. If he had been I am satisfied I would have known it."

J. B. Rawls, recalled by defendant, stated: "The defendant was at my house twice in the fall of 1879 after cattle, and on one occasion he penned cattle at my house, and the cattle remained there all night. He drove them off next morning. This was not the time he drove the steer in controversy off. At this time one of the boys, Tom Shelton or Bob Stevens, was with him. Don't know whether the other was or not. It was about a month after this that he drove off the red headed steer, and at this time he penned the cattle in the day, and drove them off same day."

We are not satisfied to a reasonable certainty that the defendant stole the steer. The evidence, whether positive or circumstantial, should lead the mind to the conclusion of guilt, to a moral certainty. This conclusion should be reached easily, naturally and conclusively, and with that degree of certainty which places the mind at rest on the question. We do not think that the evidence in this case is of such character as would make it safe for a conviction to be sanctioned, thereby making it a precedent.

The facts relied upon for a conviction are not in conflict with the fact that defendant turned the steer out of his bunch within three-quarters of a mile of the place of the supposed fraudulent taking. That defendant did have this steer cut out from his bunch is not only sworn to by two of his relatives, but two other witnesses (one being the owner) swore they saw the steer on that range subsequent to the time of the supposed taking.

We do not believe the evidence to be of that conclusive

nature which should be held sufficient to support a conviction. The motion for new trial should have been granted.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*